# THE TRUSTEES OF THE FIRST BAPTIST CHURCH in Brooklyn *v.* THE BROOKLYN FIRE INSURANCE COMPANY.(*a*)

A witness can not be allowed to testify, in an insurance case, what is meant by a *permanent policy ;* it not appearing to be a term of art, or one employed in any particular business; and it not being shown that the witness has any qualifications for interpreting it, which are not equally possessed by the judge and jury.

Proof of an admission by the secretary of an insurance company, made the morning after a loss had occurred, that the property destroyed was insured at the time of the fire, is not competent as principal evidence, being the declaration of a third person, who, though an agent of the defendant, was not then engaged in the performance of any act relating to his agency, so as to bring the case within the rule which allows the declaration of an agent, as part of the *res gestæ.*

Neither is such evidence competent for the purpose of disproving the agent's denial of the alleged admission; for an issue can not be raised upon an answer to a question put to affect a witness' credibility.

Neither is it competent as a contradiction of the secretary's testimony in which he swore there was no insurance at the time of the fire; where it appears that the testimony attempted to be contradicted was immaterial.

An agreement by an insurance company to give credit for a portion of the premium, will render the insurance binding without actual payment.

To constitute a valid contract of insurance, the minds of the parties must meet as to the premises, and the risk; as to the amount insured; as to the time the risk shall continue; and as to the premium.

In 1846 a verbal agreement was made between an insurer and the insured that until one of the parties dissented, the contract of insurance should be continuous, and the president of the insurance company should from year to year bring the renewal receipts and call for the premiums when he thought proper, after they became due. In 1847 the president offered to the insured a renewal receipt for the year which would end in July, 1848, claiming a premium of $30, instead of $25, the amount previously paid. The insured assented to the change, paid $25 and promised to pay the balance. *Held* that the change of premium terminated the arrangement between the parties made in 1846; and that it required a new bargain to effect a continuing arrangement, and to enable the insured to rely upon being called upon on behalf of the company for the premiums, instead of the usual method of taking out renewal receipts each year, as they were needed.

(*a*) Decided March term, 1863.

APPEAL from a judgment of the Supreme Court. The action was upon a contract of insurance upon the church edifice of the plaintiffs. It was tried before a jury, at the circuit, and a verdict was rendered for the defendants. And from the judgment rendered thereon, the plaintiffs appealed. Several exceptions were taken, on the trial, by the defendants, which are noticed in the following opinions:

DENIO, Ch. J.   This action was brought to recover the sum of $5000, alleged to have been insured by the defendants upon the plaintiffs' church edifice which was consumed by fire in September, 1848.   There was no written contract of insurance existing at the time the church was burned, but it had been insured one year from July 21, 1845, by a policy issued by the defendants at that date, and the instrument contained the usual clause that the insurance might be continued for such further time as should be agreed on, by the payment of the premium and by having it indorsed thereon or a receipt given therefor.   It had been continued by a renewal receipt for the following year; and before any further renewal the defendants had increased the premium from $25, the former amount, to $30, all but $5 of which had been paid for a renewal from July, 1847, to July, 1848.   A short credit had been given by the company for the payment of this balance, but the plaintiffs' treasurer had forgotten to pay it, and the renewal receipt for that year had not been delivered; and nothing had been done to procure a renewal for the following year, during which the loss happened; unless the alleged parol arrangement, upon which the plaintiffs relied, effected such renewal.   To establish such arrangement the plaintiffs examined their treasurer, A. N. Lewis, who testified to a cover-sation with Mr. Ellsworth the defendants' president, who called upon the witness at his place of business in the city of New York, two or three days prior to the 21st of July, 1846, when the first year's insurance would expire.   The witness' account of the interview is as follows: "Mr. Ells-

worth said, Mr. Lewis, I suppose you know that your policy
will expire in a day or two.  I told him I did; that I had
intended calling at the office to pay the premium and renew
the policy.  He said, my object in calling is to ascertain
whether your board of trustees does not intend to let this
policy remain with us permanently; to keep it with our
company.  I told him we did, decidedly.  He said 'I hoped
so, and supposed so.'  I then said I would call at the office
and would pay the premium.  He said he wished I would
not give myself that trouble; that he would himself call
upon me.  I told him I wished to be kept insured.  He said
I need give myself no anxiety about the matter; that I need
not call at the office; that he would attend to it himself;
that he would bring me the renewal receipts himself and
would collect the premium from me.  I said very well, we
wish to be kept insured."  Mr. Ellsworth was subsequently
examined on the part of the defendants, and denied that at
the interview referred to he had used the language mentioned
by Lewis, which imputed an arrangement for the indefinite
continuance of the insurance and his calling for the premi-
ums in future years.  This outline of the case, with such
further explanations as may be given, will enable me to ex-
amine the merits of the numerous exceptions taken by the
defendants in the course of the trial, most of which are now
relied on by the plaintiffs to reverse the judgment which was
rendered on the verdict for the defendants.

The plaintiffs' counsel inquired of the witness, Lewis,
what was meant by a *permanent policy;* and he excepted to
the ruling by which the question was rejected.  That phrase
had not been used in any part of the testimony, and if it
had been it would not have been competent for the witness
to prove its meaning, as it does not appear to have been a
term of art, or one employed in any particular business, or
that the witness had any qualifications for interpreting it
which were not equally possessed by the judge and jury.

The testimony of A. G. Stevens, who was the defendants'

secretary at the time of the transactions in question, who had been a witness on a former trial of the cause, was given in evidence by the defendants, he having since died. The following portion of that testimony was permitted to be read against the objection of the plaintiffs' counsel: "There never was any renewal of the policy in question from the 21st July, 1848—application for renewal thereof or premium paid. No act whatever to renew after July, 1848. No demand of the premium made nor renewal certificate issued or given after 21st July, 1848, nor any made out before or after that date for the continuance of the policy after that time." The exception is stated to embrace every sentence of the part extracted. The witness, as secretary, had charge of the company's office, which was in Brooklyn, and must be supposed to have had knowledge of all the books and papers kept there which related to the alleged insurance. He must also be assumed to have spoken only of facts within his own knowledge; for it would be unreasonable to suppose that his denial was meant to embrace facts which were alleged to have taken place between the president and Mr. Lewis, in New York. No ground for the objection is stated. Lewis had testified to an interview with Stevens at his office, in Brooklyn, in 1847, in which he stated that the latter had given him time for the payment of the five dollars wanting to complete the payment for that year; but it had not been, as I perceive, contended that an agreement for a continuing insurance had been made with him. It was natural that the defendants should wish to put at rest any inference that any thing in the office, or within the knowledge of the secretary, tended to establish the alleged agreement. Strictly, the evidence was unnecessary and immaterial. If the objection had been put on that ground, it is to be presumed that it would have been excluded. Immaterial evidence sometimes has a tendency to prejudice the party against whom it is given, but I can see nothing in this evidence which could possibly have had that effect. If the plaintiffs did not rely

upon any thing in the office or within the knowledge of Stevens, and I think they did not, the positive proof of the absence of any such facts could not prejudice them. If, on the contrary, they did insist upon such facts, inferentially or otherwise, it was proper to disprove their evidence.

The defendants' counsel was also allowed to read a part of Mr. Stevens' deposition, in which he stated that the president had never reported to him the existence of such an arrangement as the plaintiffs attempted to prove, and that he had never heard of any renewal or agreement to renew the policy after July, 1848. The exception based upon this ruling does not specify any grounds. It falls, for the most part, within the same reason which has been given for disallowing the last exception. It may be added that the court will so far take notice of the usual course of business as to assume that the office of an insurance company would contain a minute of all actual contracts of insurance, whether made at the office or by its officers outside of the office. Besides, the books and registers of the office, for the time to which the controversy relates, were afterwards given in evidence, without objection, and they confirmed what the secretary had sworn to.

A portion of Mr. Stevens' former testimony was to this effect: that the company's insurances were from year to year, and they were not permanent as to time, but he, the secretary, had individually made arrangements with several persons, whom he named, that he would make out their renewal receipts, when they were due, and would call upon them for the premium; and in such cases he took the receipts to them and got the money within a week or a month afterwards; that in some instances he had left receipts without receiving the premium; and that there were some such cases existing at the time of the fire in question. The plaintiffs' counsel wished to give this portion of the testimony in evidence, but it was excluded on the defendants' objection, and the plaintiffs excepted. If the objection depended upon the view of

the witness that the cases he spoke of were formal transactions and did not affect the company, I should think the ruling erroneous. But the testimony was objectionable for a different reason. Evidence of such a loose practice by the secretary with the persons named did not really tend to show that the president had made the arrangement claimed with the plaintiffs' treasurer. It was not material, upon the question of the authority of the president to make such an arrangement, for his power to do all that he had undertaken to do was expressly conceded. The only agreement which could be deduced from the testimony, if it had been received, would have been that, as the secretary was found making such informal arrangements, it was quite probable that the president had made the one claimed with the plaintiffs, though he denied it. This would not be either a logical or a legal deduction.

The only answer that Mr. Beers, the defendants' witness, gave to the question (which was allowed against the plaintiffs' objection) as to how often the plaintiffs' policy had been renewed, was that it had been renewed twice, in 1846 and 1847. The plaintiffs had claimed that such renewals had been made; and so far as the matter was material, the answer was favorable to the plaintiffs.

The plaintiffs' counsel proposed to prove by Mr. Beers that it was the usage of the company to send notices of the expiration of policies, even where there were agreements for permanent insurance, and the evidence was excluded. It had been proved without contradiction that a notice was sent to the plaintiffs' treasurer, in anticipation of the expiration of the renewal for the year terminating July, 1848. This did not prove or tend to prove that it was or was not a permanent policy in the sense in which that term was used in the question, and I do not perceive that the usage suggested would have had any just influence upon the question. It was established that so far as the office of the company from which the notices were issued was concerned, the insu-

rance upon the church had not any other character than the ordinary policies, renewable from year to year by payment of premium and renewal receipts. The giving of the notice just before the commencement of the year during which the fire happened, was in conformity with the state of things appearing in the office, and the practice of the company. It was not material what would have been done if another state of things had existed there.

The fire occurred on a Sunday morning. The following Monday morning Mr. Sandford, a trustee of the church, and Mr. Lewis, the treasurer, went to the company's office and had a conversation with Mr. Stevens, the secretary. The plaintiffs' counsel wished to prove that he had admitted on that occasion that the church was under insurance by the defendants at the time it was burned. Mr. Sandford had been examined on a former trial and had given testimony as to what took place at that interview, and had since died. According to this testimony, which the plaintiffs wished to read, Lewis said to Stevens, "I understand that you reject the policy on our house." Stevens answered, "We do not reject our policies." Something more was said which the witness stated he paid little attention to. The plaintiffs' counsel proposed to give this former testimony in evidence, but it was excluded on the defendants' objection. It would be a sufficient answer to the exception to this ruling, that the evidence did not amount to an admission of an insurance. It was rather a denial that any policy existed. It was excluded, however, apparently on the ground of irrelevancy. But the plaintiffs thereupon recalled Lewis, and broadly offered to prove by him that "Mr. Stevens, the secretary of the company, acknowledged [on that occasion] to him and Mr. Sandford, at the office of the company, that the church was insured at the time of the fire." It appeared that Stevens' attention had been called to that interview on the former trial, and he had sworn, in effect, that so far from admitting an insurance, he had stated that the church had not been insured since July

then last past. The judge excluded the testimony offered to be given by Lewis, and an exception was taken, which presents a closer question than any of the preceding exceptions. As principal evidence it was incompetent, being the declaration of a third person who, though an agent of the defendants, was not then engaged in the performance of any act relating to his agency, so as to bring the case within the rule which allows the declarations of an agent as part of the *res gestæ.* It was not competent for the purpose of disproving Stevens' denial of the alleged admission, for an issue can not be raised upon an answer to a question put to affect a witness' credibility. The only question is, whether it was not competent *as a contradiction of his* testimony in which he said that there was no insurance. There is no doubt but that if a witness testify to the existence of a material fact within the issue, the opposite party may show that he has, out of court, made a contradictory statement as to that fact, with a view to affect his credit. (*Patchin* v. *The Astor Mutual Ins. Co.,* 3 Kern. 268.) His attention must first be called to the alleged conversation, which was sufficiently done in this instance. But was the testimony to which the alleged contradiction was offered material? I have already said it was not. It was conceded upon the pleadings and throughout the case, that there was no written contract of insurance for the year in which the church was burnt, and it was not pretended that there was any verbal arrangement made with Mr. Stevens. The only one attempted to be established arose out of the conversation between Lewis and Ellsworth in New York, to which Stevens was not a party, and of which it does not appear that he had any knowledge. I think this case does not therefore fall within the rule which has been mentioned, and that the ruling was correct.

The remaining exceptions relate to the instructions to the jury. The plaintiffs desired them to be charged positively that the church was insured for the year ending in July, 1848, which was the year prior to the fire. The fact was

not directly material, though it may have been argumentatively.   The instruction given was that, if a credit was given for the five dollars, the unpaid balance of the premium, the policy attached for that year.   Only $25 of the $30 charged for the premium had been paid.   The secretary had, according to the testimony, promised to pay that balance in a short time, and had forgotten it.   This amounted to giving credit for that amount, and, if the jury believed the evidence, the insurance, according to the judge, was perfect for that year. I think there was no error here.

The judge stated to the jury in a general way what was essensential to constitute a valid contract of insurance, namely, that the minds of the parties should meet as to the premises insured and the risk; as to the amount insured; as to the time the risk should continue; and as to the premium.   The plaintiffs excepted generally, without indicating what part they found fault with, or that they desired any qualification to be stated.   I think the definition given a very accurate one, and that there was no error in laying it down.

The judge charged, in effect, that the verbal arrangement relied on must be understood as a contract to reinsure the church from year to year, at the premium charged in the policy which was running at the time the arrangement was made; and that if a different premium was subsequently exacted, and assented to, it put an end to the prior arrangement, and required a new bargain to effect a continuing arrangement.   The plaintiffs do not contend that the effect of the arrangement was that the defendants should perpetually insure them, or that they would through all time be insured by the defendants.   As they construe it, and as the reasonable interpretation would be, if the arrangement claimed was made, it was an understanding that until one of the parties dissented, the contract should be continuous, and the president should call for the premium when he thought proper, after it was due.   In 1847 the president offered to the plaintiffs' treasurer, at the place of business of the latter

in New York, a renewal receipt for the year which would end
in July, 1848, claiming a premium of $30 instead of $25.
The treasurer declined to pay the $30, and he swears that
the president insisted that it was the same which had been
paid the year before, and that it was not intended to change
the amount. It was agreed, as he says, that he should look
up the former receipt and go to the office of the company.
This he did, and the secretary refused to renew at less than
$30, and the plaintiffs' treasurer assented to the change paid
the $25, which was all he then had with him, and promised
to pay the balance. The point of the exception is, that the
arrangement of 1846 was for a continuous insurance limited
as above stated, at such premium as should be from time to
time charged by the company, and that a refusal by the
defendants' officers to go on at the former rate of premium
and the exaction of a higher rate did not amount to a disaf-
firmance of the arrangement, but only to a modification of it.
The judge's view was that a refusal by the company to renew
at the former premium put an end to the arrangement. The
question is not free from difficulty. I am, however, led to
the conclusion that the arrangement, if one existed, such as
was sworn to by Mr. Lewis, was an entire contract embracing
all its provisions, and that one of those provisions looked to
an insurance at the then existing rate of premium. It is
clear that the officers refused to insure any longer at that
rate, and that Lewis, representing the plaintiffs, agreed to
pay the additional amount charged for the year ending in
July, 1848; but he never did make that payment; and he
never in any way agreed that in future years he would pay
the increased premium. I think, therefore, that the judge
was right in holding that the change of premium terminated
the arrangement between Lewis and Ellsworth made in 1846,
and that it required a new understanding to enable the plain-
tiffs to rely upon being called upon on behalf of the company,
instead of the usual method of taking out their renewal
receipts as they were needed.

I am, therefore, in favor of affirming the judgment of the Supreme Court.

EMOTT, J.   The issues between these parties were succinctly stated by Judge Comstock, in the opinion delivered when the cause was here upon a former appeal.   (19 N. Y. Rep. 305.)   The theory of the suit, as extracted from pleadings consisting in great part, on both sides, of allegations and denials of the various facts which the pleaders expected to prove at the trial, is that the defendants had made an agreement to renew a policy of insurance from year to year, in consideration of a premium to be annually paid, either party being at liberty to give notice at any time that the arrangement was not to be continued.   I quote the language of Judge Comstock.   The policy of insurance to which he re fers was a previously existing policy of the ordinary description, by which the defendants agreed to insure the plaintiffs for one year against loss by the injury or destruction of certain premises, to a certain amount, and in consideration of a certain price or premium paid to the insurers.   This court has decided, and from its decision we are not to depart, that an agreement by parol to renew this policy from year to year, in consideration of the premiums to be annually paid, until one of the parties should signify their dissent to a further continuance of the arrangement, was not void by the statute of frauds, nor by principles of general law, nor invalidated by the express provision of a different character for the renewal of the policy contained in that instrument itself, and was within the power of the company to make.   The issue sent back for trial in the court below, was the question of fact whether such an agreement was in existence between the parties at the time of the destruction of the property alleged to have been insured, and the questions now before us are questions of the admissibility of evidence, and the proper rules of law applicable to the decision of this issue.   The policy of insurance, whose indefinite renewal was claimed by the

plaintiffs, was dated July 21, 1845, and was, as I have stated, originally issued for one year. It insured the plaintiffs against loss by fire during the period specified, on their church building, to the amount of $5000 in consideration of a premium of $25. The contract in regard to renewing this policy is alleged by the complaint, if I understand it, to have been made when the year was expiring, or had expired, for which it was originally issued. It was an agreement to keep the insurance then in force indefinitely, as I have stated, until one or the other of the parties should signify their intention to put an end to it. The policy was renewed, either under this arrangement or in the ordinary way, in July, 1846, and a certificate of renewal for one year, in the ordinary form, issued. In 1847, the defendants determined that they would not continue to insure the premises for the same premium. The parties and their witnesses are at variance as to the particulars and the effect of what took place between the persons charged with the matter at this time. The fact, however, is undisputed that the plaintiffs either paid or agreed to pay the enhanced premium for the coming year. No conversation or negotiation is proved to have occurred in July, 1848, at the end of that year. The premises were destroyed in September, 1848.

The most important question in the case arises upon the instructions of the court to the jury at the trial, as to the effect of this change of the rate of insurance upon such an agreement as that alleged by the plaintiffs to have been made in 1846. After stating, that to make a valid contract of insurance, the minds of the parties must meet upon the subjects of such a contract, including the risk, the amount of insurance, the term of time, and the premium, the judge proceeded to charge that if such a contract as the plaintiffs claimed could be established, it must be a contract to insure from year to year at the same premium, as there was no provision for a change. That is, as explained by the next proposition stated to the jury, that if the premium was

varied, a new assent of the parties to the agreement for an indefinite renewal must be established. The conclusion necessarily followed, and was stated to the jury, that a change of the premium was a refusal to continue the risk under the agreement of 1846. In response to the plaintiffs' counsel, the judge stated that the alteration of the premium was a termination of the agreement of 1846. And the judge submitted to the jury the question whether there was then, or subsequetly, an agreement to modify the original agreement by changing the rate of the premium and to continue it in force as then modified. To all this the plaintiffs excepted, and their counsel insists with great earnestness that these rulings and the refusal to hold the contrary doctrine were fatally erroneous.

It seems to me that no such fault can be found with the rule thus laid down as applicable to the issue presented by the pleadings and the evidence. The counsel for the plaintiffs urges that he should have been allowed to explain and to recover upon what is styled "a permanent policy;" and again that there might be an agreement to renew a policy of insurance indefinitely at "the current rate of premiums." The ideas which these terms and propositions represent, have little to do with the real issue in this case. The phrase "permanent policy" was introduced at the trial by a witness for the plaintiffs, who was not an officer of the defendants or of any other insurance company, and not familiar with their contracts or usages. But the action was not brought upon an original parol agreement for the insurance of these premises, such as would seem to be intended by this expression. The original agreement between them was an ordinary policy of insurance, for a definite time, and at a specified rate. The plaintiffs allege, not that the defendants made a new parol contract of insurance, indefinite as to time and price, or to last indefinitely, notwithstanding any variation in any of its terms, but that they made an agreement to renew this previously existing contract, from year to year, until one or

the other of the parties dissented. The parol agreement alleged, had reference, clearly and exclusively, to the previous written contract, and was for the renewal of that contract; and it seems to me to be merely stating it over again, or stating its legal effect, to say that when the insurance company refused to continue to insure the premises of the defendants at the rate which was fixed by the policy to which the first agreement referred, they refused to continue the risk under the agreement to renew that policy. The question then arose at once, and was distinctly and fairly submitted to the jury, whether, when this change of the terms of the original contract was made, the agreement testified to by the plaintiffs' witnesses to continue the former contract, was continued or renewed as to the new one. The premium or rate of insurance in such a contract is certainly one of its terms. The minds of the parties must meet upon it as well as upon the residue of the contract, and when they have met and formed the contract for a definite period and then renewed it, and they afterwards modify the original contract in such a particular, they must certainly, expressly or impliedly, agree to the indefinite renewal of the substituted agreement, in order to continue it in like manner as the first, unless it was a part of their original agreement that the contract of insurance should continue at whatever rate. As I have said, I do not find any such contract as this alleged in the pleadings or testified to by the witnesses. The original contract was a definite one in this as in other particulars, and the plaintiffs rely upon its renewal. There is nothing in the evidence as to a contract to renew the policy at what is called the current rate of insurance. In truth, every contract of fire insurance is special. No two risks are precisely alike. There are classes of risks of more or less hazard, arising from the nature or the situation of the property insured, but after all the contract is special in each case. I do not say that parties might not agree expressly upon an insurance for a definite or indefinite time, at what might be the current

rate of such insurances. It would not be impossible, but it would certainly be difficult to explain and apply such a term in such contracts. But unless it were made expressly a part of the agreement, such an element would be foreign to the nature and subject of the contract, and to the ordinary method of the business of insurance against fire. It may be that a parol contract of insurance might be sustained for an indefinite time and at an indefinite rate of premium, and perhaps such a contract might be sustained, notwithstanding the existence of a written contract, definite as to both time and rate of premium. But there is no such question in this case. The issue here is upon the continuance of the original agreement between these parties, and when that was changed, as it admittedly was, by a change of the premium, all that the plaintiffs could ask, and perhaps more than they could demand under their present pleadings, was to have the question submitted to the jury, whether the alteration was accompanied by an agreement to renew the insurance from year to year, without prepayment and without notice, under the new premium as had been agreed under the old.

There were various offers made at the trial to prove the practice of the defendants in their insurances of other parties. The answer to these propositions is that the question in this case is not of the powers of the defendants, nor of their usages, but of the actual agreement made by the officers of the company with the plaintiffs in particular. Evidence of what took place with other parties could not prove a contract with the plaintiffs, and we are asked here to establish and not to interpret such a contract.

The questions and offer to prove what was the meaning of the words "permanent policy," were inadmissible or immaterial for reasons which have already been in part suggested. The witness of whom it was proposed to ask the question was not shown to be in any way competent to answer it, the inquiry was not material to the real issue in the case, and the

definition sought to be given was accepted by the court, if it was necessary or proper to adopt any definition of the phrase.

The plaintiffs offered to show that it was the usage of the company in cases of agreement for permanent insurances, similar to the one in the present case, to serve notices of the expiration of the policies. The defendants had proved without objection, that notice had been given by them in 1846 and 1847 to the plaintiffs, that the policy held by the latter would expire on a certain day when the year for which it was originally made, or during which it had been renewed, would terminate. If it had been intended to show that such notices were usually given by the company to parties who had an understanding or arrangement that their policies should be renewed from year to year, the offer should have been more explicit, and it should not have contained the assumption that the plaintiffs had effected with the defendants an agreement for a permanent insurance. In truth, however, the whole question was one not to be determined or affected by the dealings of the company with other parties. There could not be a custom as to such a matter. Known and recognized usages and customs may be proved to explain or qualify what is doubtful or equivocal in a contract, but not to explain an act such as giving notice of its termination. If it had appeared that there were contracts with other persons for renewal of their policies from year to year until forbidden, which was not proved, and as we have seen was not evidence in itself, and if it had then appeared that such persons were notified that their insurance would terminate at the close of every successive year, this would not have affected the question of the existence of such an arrangement with the plaintiffs. What the defendants chose to do with other parties was immaterial to the plaintiffs, and as I have said, this was the whole scope of the offer. It was not a case of a custom or usage, in any proper sense, but simply an offer to prove how the defendants dealt with other persons than the plaintiffs.

There are many other questions of evidence in the case

which I do not propose to discuss. They have been consid-
ered at large by Judge Denio, and in his views in regard
to them all the Judges concur. The judgment should be af-
firmed with costs.

Judgment affirmed.